# *IMPORTANT NOTICE*
## *NOT TO BE PUBLISHED OPINION*

*THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28 (4) (c), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS AUTHORITY IN ANY OTHER CASE IN ANY COURT OF THIS STATE.*

RENDERED: FEBRUARY 23, 2006
NOT TO BE PUBLISHED

# Supreme Court of Kentucky FINAL

2005-SC-0710-WC

DATE _3-16-06 E\i\R\Growth,D.C._

CHARLES SHOEMAKER                                              APPELLANT

APPEAL FROM COURT OF APPEALS
V.                              2005-CA-0042-WC
WORKERS' COMPENSATION NO. 01-90031

IRVING MATERIALS, INC.;
HON. IRENE STEEN,
ADMINISTRATIVE LAW JUDGE; AND
WORKERS' COMPENSATION BOARD                                    APPELLEES

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

On May 8, 2001, a front tire on the cement truck that the claimant was driving blew out, causing the truck to go over an embankment and land on its side. An Administrative Law Judge (ALJ) awarded permanent partial disability benefits for the claimant's back injury but determined that his cervical condition was not caused by the accident. Although the claimant asserted that the ALJ relied upon flawed medical opinions regarding the cervical condition and drew conclusions that were beyond the scope of the medical evidence, the Workers' Compensation Board and the Court of Appeals affirmed. We affirm.

Records of the Carroll County EMS and Carroll County Hospital indicated that the claimant had not been restrained at the time of the accident. He complained to the

EMS of pain in the head, thorax, and spine and arrived at the hospital by ambulance "in full spine precaution." In the emergency room, he complained of pain in the head, neck, and back and was treated for scalp lacerations, multiple contusions, and what appeared to be an acute compression fracture at T8. Although a CT scan of the head and x-rays of the cervical spine were normal, x-rays revealed compression deformities at T3 and T8. Furthermore, a CT scan revealed rib fractures at T5, T6, and T7. Dr. Conard admitted the claimant, and his condition was stabilized. In consultation with Dr. Campbell, Dr. Conard discharged the claimant on May 10, 2001, with a diagnosis of occipital scalp laceration, compression fractures at T3, T5, and T8, multiple rib fractures, and multiple contusions and abrasions. He transferred the claimant to Dr. Campbell's care at Norton Hospital where he remained until May 14, 2001. A bone scan performed at Norton Hospital indicated that the compression fractures were probably chronic rather than acute.

On June 20, 2001, Dr. Campbell noted that the claimant's pain had improved, that he denied any arm or leg symptoms, and that he localized the pain in the upper thoracic region. He complained of some headaches and indicated that he would see his family doctor. On August 8, 2001, he indicated that the thoracic pain was better but complained of "some interscapular difficulty more in the musculature region." On October 24, 2001, the claimant continued to experience "some soft tissue problems," some upper thoracic pain, and a little left arm pain, which Dr. Campbell attributed to radiculopathy. Dr. Campbell prescribed anti-inflammatory medication and noted that x-rays of the cervical spine showed good alignment.

On December 3, 2001, Dr. Gleis evaluated the claimant's thoracic condition for the employer. At that time, x-rays showed multi-level spurring and compression

-2-

fractures at T3, T5, and T8. Dr. Gleis took a history, performed a physical exam, and reviewed the medical records from May 10, 2001, forward. Like Dr. Campbell, he diagnosed soft tissue pain that was consistent with an injury to the upper thoracic spine and with the compression fractures. He assigned an 8% thoracic impairment using the range of motion model due to multiple fractures.

On February 12, 2002, the claimant saw Dr. Rice, an associate in a neurology and sleep science group. He complained of severe headaches and gave a history of increasingly frequent pain in his neck, shoulder, and back of his head and associated the pain with the May, 2001, accident. He also reported a 1969 accident and resulting hospitalization for a thoracic compression fracture. Dr. Rice diagnosed a myofascial pain syndrome associated with headache, found signs of possible cervical radiculopathy, and prescribed Ultracet and Zanaflex. He recommended cervical x-rays and MRI. On March 5, 2002, the claimant reported some improvement in his symptoms. Dr. Rice increased his medication and ordered an MRI.

On April 17, 2002, the claimant returned to Dr. Campbell, complaining of neck, right arm, and shoulder pain. A physical examination revealed a limited range of motion in the neck, and Dr. Campbell noted that x-rays and MRI revealed a disc osteophyte complex at C5-6, facing the cord and compressing the nerve root on the right. He recommended a series of epidural injections. Dr. Campbell's report of August 28, 2002, indicates that the claimant reported continued neck pain, headaches, interscapular pain, and arm pain. A recent MRI revealed a C5-6 disc protrusion for which Dr. Campbell recommended a cervical discectomy and fusion with plating. He referred the claimant to Dr. Harpring

Dr. Harpring evaluated the claimant on September 25, 2002, at which time he

-3-

complained of cervical and shoulder pain that had persisted since the May, 2001 accident. He indicated that the pain was initially attributed to soft tissue injury and that a cervical MRI was performed only after conservative treatment failed. Dr. Harpring noted that the MRI revealed multi-level involvement from C4 through C7. The MRI showed severe cervical spondylotic disease and collapse of the C5-6 disc space, causing significant cervical stenosis but no significant spinal cord compression. There was also significant spondylotic disease at C4-5 and C6-7 but less severe than at C5-6. Before recommending surgery, he ordered a myelogram, which revealed abnormalities from C3-4 through C6-7. X-rays revealed mild spondylosis and multi-level bony foraminal stenosis of the lower cervical spine, greatest at C5-6 and C6-7. They also revealed plaquing with 25% wedging at the mid and upper thoracic vertebrae. Thus, Dr. Harpring performed an anterior cervical discectomy and fusion at C5-6 and C6-7 on January 24, 2003. On April 24, 2003, he released the claimant to return to work. On July 30, 2003, Dr. Harpring determined that the claimant had reached maximum medical improvement and advised him to return only as needed.

Dr. Bilkey evaluated the claimant at his attorney's request on September 29, 2003. He concluded that the May, 2001, accident caused the three thoracic compression fractures and thoracic spinal cord syrinx at T9 and T10. He also concluded that the cervical radiculopathy was caused by both the accident and pre-existing degenerative disease. In his opinion, all medical treatment since May, 2001, was reasonable, necessary, and attributable to the accident. He recommended no further treatment at present but noted that the cervical condition would probably require future physical therapy and perhaps surgery. He assigned a 35% whole person impairment to the effects of the accident, attributing a 22% impairment to the cervical

-4-

condition and a 16% impairment to the thoracic condition (exclusive of the syrinx which required additional treatment and evaluation).

On December 12, 2003, Dr. Gleis reviewed medical records for the employer. The earliest was Dr. Campbell's June 20, 2001, report in which the claimant denied any arm symptoms. Dr. Gleis stated that the first indication of a cervical condition appeared in Dr. Campbell's October 24, 2001, note regarding left arm symptoms. It mentioned "possible radiculopathy" but contained no supporting findings from the physical exam, leading Dr. Gleis to conclude that Dr. Campbell's description of the symptoms was consistent with cervical spondylosis rather than an acute herniated disc. Dr. Gleis noted that his own exam on December 2, 2001, did not document any upper extremity radicular symptoms and that the physical exam was negative for radicular findings. It was not until April 17, 2002, after the cervical MRI, that a physical exam produced findings of possible radiculopathy. Dr. Gleis noted that the cervical imaging studies were most consistent with chronic spondylosis rather than an acute change. He acknowledged that the "interscapular difficulty" noted on August 8, 2001, might actually have been referred pain from both the cervical and thoracic regions. He also acknowledged that the accident "could possibly" have aggravated the pre-existing cervical spondylosis and caused the referred pain. He concluded, however, that the "the preponderance of the evidence" indicated that cervical condition was asymptomatic after the accident and that the natural aging process (cervical degenerative disc disease) was what necessitated the surgery.

Dr. Schiller evaluated the claimant on February 5, 2004, for the employer. He performed a physical exam, took a history, and conducted a medical records review, including those from the Carroll County Hospital emergency room. The claimant gave a

-5-

history that included an upper thoracic spine fracture when he was 19 years old and an upper back injury in a 1969 motor vehicle accident. Dr. Schiller noted that although the claimant reported a sore neck following the May, 2001, accident, the records contained little evidence of neck symptoms. He diagnosed degenerative cervical spondylosis, a T3 fracture that pre-dated the accident, and a soft tissue cervical spine injury and thoracic fractures at T5 and T8 that were due to the accident. Dr. Schiller assigned a 12% impairment for the cervical condition, disagreed with the use of a range of motion impairment for the thoracic injury, and rated the thoracic impairment at 5%. He attributed the surgery to the underlying degenerative cervical changes rather than to the accident.

Describing the accident, the claimant testified that he struck his head when the cement truck landed on its side. His symptoms included pain in the upper back, neck, shoulders, ribs, arm and left elbow and headaches. He was questioned extensively regarding the first time he complained of neck pain following the accident and stated that he reported it every time he saw a physician and did not understand why the records contained no neck complaints until February, 2002, when he was referred to Dr. Rice. He stated that he filled out pain diagrams but had been advised that they had been destroyed because they were normally used only by the physician.

After summarizing the evidence, the ALJ noted that the claimant was "brought to the hospital in a soft cervical collar, however, that appears to be pretty well standard MO after a traumatic event." Early cervical spine x-rays were normal. Although he sustained a seven centimeter occipital laceration, which was sutured, there were no specific complaints relative to the cervical spine and no diagnosis of cervical spine problems. He first complained of headaches on June 20, 2001, about six weeks after

-6-

the accident, but denied any arm or leg symptoms. Although he told Dr. Campbell he would follow up on the headaches with his family physician, there was no indication that he did. He returned to work on August 27, 2001. Not until February 12, 2002, did he report persistent and increasingly severe neck, shoulder, and head pain to Dr. Rice and associate it with his other symptoms following the accident. Relying on Drs. Gleis and Schiller, the ALJ concluded that the cervical symptoms and underlying condition were due to the natural aging process rather than the accident. Noting that there was evidence that the T3 compression fracture pre-dated the accident, the ALJ relied upon the 8% impairment that Dr. Gleis assigned. The claimant's petition for reconsideration concerned the duration of temporary total disability and was granted.

Citing Cepero v. Fabricated Metals, 132 S.W.3d 839 (Ky. 2004), the claimant asserts that testimony from Drs. Gleis and Schiller did not constitute substantial evidence because they did not have a complete history of his complaints; whereas, the other medical evidence supported a finding that the cervical condition was work-related. He also asserts that the ALJ erred by going beyond the scope of the medical evidence when stating that the use of a cervical collar is standard procedure after a traumatic event. Furthermore, he asserts that the Board erred in determining that Hall's Hardwood Floor Co. v. Stapleton, 16 S.W.3d 327 (Ky. App. 2000), and Eaton Axle Corp. v. Nally, 688 S.W.2d 334 (Ky. 1985), required him to petition for reconsideration of the latter error.

The claimant's reliance on Cepero v. Fabricated Metals, supra, is misplaced. This is not a case in which the ALJ relied on a medical opinion that was based on a substantially inaccurate or largely incomplete medical history. The EMS, Carroll County Hospital, and Norton Hospital records from May, 2001, contain little mention of neck

symptoms. Dr. Schiller obtained a history from the claimant and reviewed the records from immediately after the accident, noting little mention of neck symptoms. He also reviewed subsequent records. Dr. Gleis did not have the Carroll County EMS and Hospital room records when he performed his 2003 evaluation; however, he did have records from Dr. Campbell and the May 10, 2001, Norton Hospital admission when he examined the claimant and took a history in December, 2001. In 2003, he conducted an exhaustive review of Dr. Campbell's records from June 20, 2001, forward; his own December, 2001, findings; and the subsequent medical records. Both Dr. Schiller and Dr. Gleis acknowledged that the cervical condition could have been related to the accident but ultimately concluded that it was not. Dr. Bilkey disagreed. Under the circumstances, it was for the ALJ to draw reasonable inferences, to weigh the conflicting testimonies, and to decide upon whom to rely. Contrary to the claimant's assertion, the ALJ's findings of fact and conclusions of law reflect a careful weighing of the conflicting medical evidence and were reasonable under the evidence. Special Fund v. Francis, 708 S.W.2d 641, 643 (Ky. 1986). As noted by the Court of Appeals, when read in context, the comment of which the claimant complains appears to be more in the nature of a passing remark than an unsupported medical conclusion; therefore, it is unnecessary for us to consider whether a petition for reconsideration was required.

The decision of the Court of Appeals is affirmed.

All concur.

COUNSEL FOR APPELLANT:

Wayne C. Daub
730 West Main Street, Suite 200
Louisville, KY 40202


COUNSEL FOR APPELLEE,
IRVING MATERIALS, INC.:

Judson F. Devlin
Fulton & Devlin
Browenton Place, Suite 165
Louisville, KY 40222